IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
NO. _____

| | |
|---|---|
| **RODERICK BROWER,**<br><br>PLAINTIFF,<br><br>vs.<br><br>**THE TRUSTEES OF SANDHILLS COMMUNITY COLLEGE; ALEXANDER M. STEWART;** in his individual capacity and official capacity as President of Sandhills Community College; and **DAVID S. FARMER, Jr.;** in his individual capacity and official capacity as Executive Vice President of Sandhills Community College,<br><br>DEFENDANTS. | **COMPLAINT AND DEMAND FOR JURY TRIAL** Title VII, 42 U.S.C. §§ 1983 and 1988 |

NOW COMES Plaintiff Roderick Brower, by and through undersigned counsel, complaining of the Defendants as follows:

## INTRODUCTION

1.      This civil rights action arises from the 2024 wrongful termination of Plaintiff Roderick Brower from his employment as Chief Information Officer ("CIO") at Sandhills Community College ("SCC"), a public college in Pinehurst, North Carolina.

2.      Just one year before the passage of the 1964 Civil Rights Act, North Carolina formally established the North Carolina Community College System. That same year, 1963, Sandhills Community College was established.

3.    Today, SCC publicly promises to "treat[ ] its students, faculty, and staff fairly," "stand[ ] behind the commitments that are stated or implied in its policy documents," "advanc[e] access and opportunity in an inclusive environment," "dismantl[e] equity barriers," and support "personnel of the highest quality who reflect its diverse community and exhibit its core values."

4.    SCC's promises ring hollow to Mr. Brower, SCC's African American former Chief Information Officer and Chief Information Security Officer. Despite his 18 years of service, state and industry recognition for his performance, numerous statewide leadership roles, authorship of SCC's IT policies, pristine employment record, and compliance with SCC employee and IT policy, SCC wrongfully disciplined and subsequently terminated Mr. Brower on November 11, 2024 based on a pretextual finding of "gross personal misconduct" Defendants claim arose from Brower's accessing of Defendant Stewart's SCC computer as part of spearheading SCC's response to a public records request.

5.    The facts actually show that Mr. Brower acted squarely within the scope of his job responsibilities as CIO, compliant with policy, and in response to Defendants' tasking him with spearheading SCC's collection of electronically stored information ("ESI") responsive to the public records request of SCC's former human resources director, Chreatha Alston, who like other Black SCC employees, endured racial discrimination while employed at SCC.

6.    Mr. Brower endured a worse fate: not only racial discrimination while employed, but also the termination of his employment out of retaliation for speaking

up about this discrimination only two days before, and in the face of similarly-situated white employees committing actual violations with no disciplinary action in response.

7.     While described below, SCC's racially disparate and hostile work environment is perhaps best captured by the sworn testimony of Ms. Alston and former Vice President and current adjunct professor Dr. Fallon Brewington, whose declarations are attached hereto as exhibits and incorporated by reference. Ms. Alston and Dr. Brewington each provide detail to the disparate treatment they both witnessed and experienced, including examples of similarly situated white employees receiving favorable treatment compared to their Black peers.

8.     The content of these recently sworn declarations is old news to Defendants. In 2023 and/or 2024, Ms. Alston and Dr. Brewington lodged complaints with SCC leadership regarding the disparate treatment they each had faced and seeking action. So too had Mr. Brower by way of written notice to SCC's interim President in 2023.[1] More notice came from Ms. Alston and Dr. Brewington's to filing of EEOC charges in 2024, with Ms. Alston emailing a copy of her charge to SCC leadership upon filing and submitting a related public records request.

9.     That public records request was the catalyst for the wrongful termination at issue here. On August 20, 2024, Defendants and Brower jointly

---

[1] By email in February 2023, Mr. Brower informed SCC interim President Brenda Jackson that his knowledge and professional reputation was disproportionately disrespected, his decisions and recommendations were disproportionately scrutinized, and a custom of passive aggression among SCC leadership constantly put him on the defensive and made him feel like he had "a target on his back." SCC took no action.

received a public records request from Ms. Alston. The next day, Defendant Stewart and Executive Vice President Defendant Farmer met with Mr. Brower as CIO to formulate a plan to respond to the request. Mr. Brower was tasked with spearheading pre-production collection of responsive records, and expressly discussing with Defendants Stewart and Farmer that he would be accessing their SCC email accounts as part of the effort.

10.     The following day, August 22, Mr. Brower began his efforts, which included accessing the SCC computer in Defendant Stewart's office. With the assistance of Stewart's executive assistant, Mr. Brower scheduled this work at a time that would not interrupt Dr. Stewart's work. During his tenure as CIO, Mr. Brower had on several prior occasions worked in the President's office in this fashion and at times completely unattended. As CIO and CISO, and having written the college's IT and accessible use policies and co-authored the North Carolina IT Standards Committee's state-level access policy, Mr. Brower had no questions or concerns with his work.

11.     Before Mr. Brower finished, President Stewart entered his office. SCC policy and Mr. Brower's role and performance as CIO notwithstanding, Mr. Stewart acted shocked and demanded an explanation. Mr. Brower, perplexed himself by Stewart's reaction, did his best to explain the obvious, only to be told by Defendant Stewart his actions would be "investigated."

12.     The next day, Defendants questioned Mr. Brower again, demanding that he provide a written statement. Mr. Brower felt yet again that he was being subjected

to a treatment not experienced by his white colleagues, a feeling confirmed when (1) Defendants immediately put him on administrative leave, then (2) attempted to coerce him into signing a related legal document.

13.     On August 28, 2024, Mr. Brower emailed Defendant Farmer to notify Defendants that he would be filing an EEOC claim.

14.     On November 1, 2024, Defendant Farmer notified Mr. Brower of his conclusion that Brower's actions constituted "gross personal misconduct," and thus his recommendation to Defendant Stewart of Brower's dismissal.

15.     On November 9, 2024, Mr. Brower responded, noting Defendants' failure to follow SCC's written due process procedures, and pointing out his actions as CIO did not violate any applicable policy and were part and parcel of the duties Defendants had tasked to him as CIO. Combined with his tenure and track record, Mr. Brower's response put Defendants on notice their actions and conclusion were discriminatory and retaliatory, and respectfully requested SCC produce the documents and records underpinning Defendants' claims and Mr. Brower's actions.

16.     The next business day, SCC terminated Mr. Brower.

17.     Out of context, Defendants' termination of Mr. Brower may seem merely an unusual overreaction followed by a post-hoc effort at justification. But the treatment of Mr. Brower from August 21, 2024 through his wrongful termination is no isolated incident. Rather, it fits within a firmly established, widely known, and well documented custom, pattern, and practice of SCC's racially discriminatory and hostile work environment in which Black employees—especially those in leadership

positions—have been systematically and disproportionately over-scrutinized, over-disciplined, overlooked, under-paid, under-resourced, disrespected, and ultimately forced out, often to be replaced by less qualified white employees.

18.     This context, along with Mr. Brower's longstanding SCC service and recognized standing in the industry makes clear the pretextual nature of Defendants' stated reasoning for terminating Mr. Brower. The true motivation was his race, as has been the motivation for Defendants' actions in so many times prior, whether in the form of pay disparity, failure to promote, or likewise a surprising willingness by SCC and its leadership to tolerate serious breaches of policy and protocol by white employees similarly situated to Mr. Brower.

19.     The process, outcome, and context of the investigation, disciplinary leave, and ultimate termination of Mr. Brower violated SCC's policies, federal law, North Carolina public policy, and Mr. Brower's constitutional rights. It has caused Mr. Brower significant economic damages in the form of loss of income, loss of retirement benefits, and beyond. It has caused him professional and reputational harm. And it has caused him severe emotional distress, as documented in his medical records.

20.     Mr. Brower now brings this action to seek damages under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e) (Claims I–III), 42 U.S.C. § 1983 (Claims IV–VII) for wrongful termination, retaliation, hostile work environment, and violation of constitutional rights under color of law, and also to seek damages under

North Carolina common law for wrongful discharge in violation of public policy (Claim VIII) and negligent infliction of emotional distress (Claim IX).

**PARTIES**

**Plaintiff Roderick Brower**

21.     Plaintiff Roderick Brower is a resident and citizen of Moore County, North Carolina.

22.     Mr. Brower is a 56-year-old African American man.

23.     Mr. Brower was employed by SCC as a System Administrator from May 1997 to October 2007, then as Chief Information Officer from January 2016 until his wrongful termination in November 2024.

**Defendant Trustees of Sandhills Community College**

24.     Defendant Trustees of Sandhills Community College (collectively, "SCC") constitute the governing body of SCC pursuant to N.C.G.S. § 115D-12, *et. seq*.

25.     SCC is a public community college chartered in 1963 and a member of the North Carolina Community College System.

26.     SCC's main campus is located in Pinehurst and Southern Pines, in Moore County, North Carolina.

27.     Defendant SCC's current Trustees include: Larry R. Caddell (Chairman); Timothy A. Carpenter (Vice Chairman); Joseph A. Clendenin (Secretary); John W. (Billy) Carter; Wendell F. (Dell) Cook; Gary W. Evans; Eugene B. Horne, Jr.; Anthony Hunt; Bruce C. Hurst; David McLean; Helen Probst Mills; Irish B. Pickett; Beth Ann Pratte; and Stephen Woodward.

28.     As SCC President, Defendant Stewart serves as a non-voting member of the SCC Board of Trustees.

29.     Defendant SCC supervises Defendant Stewart.

**Defendant Alexander M. Stewart**

30.     Defendant Dr. Alexander "Sandy" M. Stewart ("President Stewart" or "Defendant Stewart") is the President of Sandhills Community College. He began his tenure as SCC President in the summer of 2023.

31.     Upon information and belief, Defendant Stewart is a resident and citizen of Moore County, North Carolina.

32.     Defendant Stewart is a white male.

33.     At all times relevant to this action, Defendant Stewart acted as the agent of his employer, Defendant SCC.

34.     At all times relevant to this action, Defendant Stewart served immediate supervisor to Defendant Farmer and all other Vice Presidents at SCC.

35.     At all times relevant to this action, Defendant Stewart was acting under color of state law.

**Defendant David S. Farmer, Jr.**

36.     Defendant Dr. David "DJ" S. Farmer, Jr., ("Vice President Farmer" or "Defendant Farmer") is the Executive Vice President of Sandhills Community College.  He began his tenure as a Vice President at SCC in 2022 after previously serving in other roles.

37. Upon information and belief, Defendant Farmer is a resident and citizen of Moore County, North Carolina.

38. Defendant Farmer is a white male.

39. At all times relevant to this action, Defendant Farmer acted as the agent of his employer, Defendant SCC.

40. At all times relevant to this action, Defendant Farmer was directly supervised by Defendant Stewart.

41. At all times relevant to this action, Defendant Farmer served as Mr. Brower's immediate supervisor.

42. At all times relevant to this action, Defendant Farmer was acting under color of state law.

## JURISDICTION AND VENUE

43. Mr. Brower brings this action under Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e, *et seq*.) (Claims I–III) and 42 U.S.C. § 1983 (Claims IV–VII) for wrongful termination, retaliation, hostile work environment, and violation of constitutional rights under color of law.

44. Mr. Brower also brings this action under North Carolina common law for wrongful discharge in violation of public policy (Claim VIII) and negligent infliction of emotional distress (Claim IX).

45. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is an action based on violations of federal law (Claims I–VII).

46.    This Court has supplemental jurisdiction over Mr. Brower's state common law claims (Claims VIII and IX) pursuant to 28 U.S.C. § 1367.

47.    Defendants are each subject to the personal jurisdiction of this Court because: they each reside in or have their principal place of business in Moore County, North Carolina, within this judicial district; they are each present in and regularly conduct affairs and business activities in this judicial district; and the conduct that is the subject of this lawsuit occurred within this judicial district.

48.    Venue is proper in the Middle District of North Carolina because the events giving rise to this action occurred in Moore County, and all Defendants reside in or have offices in Moore County, within this judicial district.

49.    On August 28, 2024, Mr. Brower filed an Inquiry Information form with the EEOC against SCC alleging racial discrimination, sex discrimination (sexual orientation), hostile work environment, and retaliation. (*See* Exhibit 1).

50.    On January 7, 2025, Mr. Brower timely filed a Charge of Discrimination with the EEOC against SCC alleging racial discrimination under Title VII. (*See* Exhibit 2, EEOC Charge of Discrimination Form).

51.    On January 23, 2025, the EEOC issued a Determination and Notice of Rights ("Right to Sue letter") notifying Mr. Brower that the EEOC would not proceed with its investigation and making no determination about whether further investigation would establish Title VII violations. (*See* Exhibit 3, EEOC Right to Sue Letter).

52.     This Complaint is being filed within all applicable statutes of limitation and statutes of repose.

53.     Mr. Brower has exhausted all applicable administrative remedies.

## EXHIBITS

54.     Attached hereto and incorporated by reference are the following exhibits referenced herein:

- Exhibit 1: Mr. Brower's August 28, 2024 EEOC Inquiry Form;
- Exhibit 2: Mr. Brower's January 7, 2025 EEOC Charge of Discrimination Form;
- Exhibit 3: Mr. Brower's January 23, 2025 EEOC Right to Sue Letter;
- Exhibit 4: Declaration of Chreatha Alston;
- Exhibit 5: Vice President Farmer's November 1, 2024 Written Notice of Charges;
- Exhibit 6: Mr. Brower's November 9, 2024 Written Rebuttal;
- Exhibit 7: President Stewart's November 11, 2025 Written Notice of Dismissal to Mr. Brower;
- Exhibit 8: Declaration of Dr. Fallon Brewington;
- Exhibit 9: Mr. Brower's SCC FY24-25 Employment Contract, start date August 1, 2024;
- Exhibit 10: Mr. Brower's August 23, 2024 handwritten statement regarding administrative leave.

## FACTS

**Mr. Brower's Qualifications and Performance**

55.     In 1992, Mr. Brower received an associate's degree in business administration from SCC.

56.     In 1993, Mr. Brower received an associate's degree in applied science in business computer programming from SCC.

57.     In 2003, Mr. Brower received a Bachelor of Science degree in business administration and management information systems from the University of North Carolina at Pembroke.

58.     Mr. Brower first worked for SCC as a systems administrator from May 1997 to October 2007.

59.     Mr. Brower had no warning or disciplinary actions of any kind in his personnel records during this time.

60.     From October 2007 until January 2016, Mr. Brower was employed by Fayetteville Technical Community College, a public community college in Fayetteville, North Carolina, where he served as Chief Information Officer.

61.     In January 2016, Mr. Brower was hired by SCC's then-President Dr. John Dempsey to serve as SCC's CIO.

62.     At the time of his hiring as SCC's CIO, Mr. Brower was highly qualified for that position.

63.     Prior to the incident giving rise to his termination, Mr. Brower maintained a pristine personnel record. He had no prior warnings or disciplinary actions of any kind in eighteen years of employment with SCC.

64.     Mr. Brower was also a highly skilled and highly regarded CIO. He received numerous statewide honors and recognitions for his performance and contributions as CIO, including, for example: being elected as the first chair of the North Carolina Community Colleges State IT Standards Committee in 2009; serving on the IT Requirements Oversight Committee, for which he was recognized by UNC

System President Peter Hans in 2020; being voted by his statewide peers to receive the State IT Achievement Award in 2013; twice serving as the president of the North Carolina Community College IT Association; and serving as president of the North Carolina Community College CIO Association in 2024.

65.    As of August 2024, Mr. Brower remained highly qualified for his position as SCC's CIO. During his tenure at SCC, he regularly received praise and accolades from his supervisors and superiors.

66.    Mr. Brower was not an "at-will" employee who could be terminated for any or no reason. Rather, Mr. Brower's employment contract established that SCC could only terminate Mr. Brower's employment "in accordance with the reasons and in the manner set forth in College policies." (Exhibit 9 ¶ 3, Brower/SCC Employment Contract).

**SCC President Transition**

67.    From 1989 until 2022, Dr. John Dempsey served as the President of SCC.

68.    Upon information and belief, during Dr. Dempsey's tenure as SCC President, and especially from 2012–2022, the number of Black employees in positions of leadership significantly increased. This increase occurred through both the hiring of new Black employees into leadership positions and the promotion of existing Black employees into leadership positions.

69.    In 2022, Dr. Dempsey retired as President of SCC.

70. In 2022 and 2023, Defendant SCC engaged in a search and selection process to hire a new President.

71. At the end of this hiring process, Defendant SCC was considering two finalist: Defendant Stewart and Dr. Greg McLeod.

72. Upon information and belief, Defendant Stewart had no prior experience in higher education administration before being hired by Defendant SCC as President in 2023.

73. Defendant Stewart had recently served as a member of the SCC Board of Trustees.

74. Dr. McLeod was a highly-qualified African American man with extensive experience in higher education administration.

75. In the spring of 2023, Defendant SCC hired Defendant Stewart as President of SCC over Dr. McLeod.

76. After Defendant SCC's selection of Defendant Stewart as SCC President, SCC Vice President and Chief Operations Officer Ron Layne stated to Mr. Brower that SCC's financial benefactors were "not ready" for a Black college president, and that Defendant SCC feared their financial and foundation support would suffer under a Black president.

77. During Defendant Stewart's tenure as SCC President, the number of Black employees in positions of leadership at SCC has decreased.

## Development of Racial Disparities and a Hostile Work Environment for Black SCC Employees

78.    In recent years, and especially since Defendant Stewart's tenure as SCC President began, a pattern, custom, and practice of a hostile work environment characterized by known and significant racial disparities developed at SCC for Black employees, particularly those in leadership positions. (*See* Exhibit 4 ¶ 2, C. Alston Declaration; Exhibit 8 ¶ 3, F. Brewington Declaration).

79.    Black SCC employees in leadership positions—including Mr. Brower— have been systematically and disproportionately over-scrutinized, over-disciplined, overlooked, under-paid, under-resourced, disrespected, and ultimately terminated or forced to resigned. (*See* Exhibit 4 ¶ 2; Exhibit 8 ¶ 4).

80.    **Pay Disparities**. Using publicly available salary data, Black SCC employees have identified significant and systematic pay disparities between Black SCC employees and their white counterparts. (*See* Exhibit 4 ¶ 2; Exhibit 8 ¶ 4).

81.    For example, SCC's recent practices have included:

a.  Granting raises to white employees without changes in job duties, while employees of color were assigned additional job duties without corresponding raises; (*see* Exhibit 4 ¶ 2; Exhibit 8 ¶ 4);

b.  Providing significant raises to white school leaders, including four white vice presidents, but not to the sole Black vice president; (*see* Exhibit 4 ¶ 2; Exhibit 8 ¶ 4);

c.  Disparities in promotion-related raises, with employees of color receiving average raises of less than $5,000, while at least two white

employees received approximately $20,000 each in annual raises. (*see* Exhibit 4 ¶ 2; Exhibit 8 ¶ 4).

82. **Resource Disparities**. SCC and Defendants have developed and perpetuated racial disparities in resources provided to certain leaders or departments. Black school leaders frequently have had to request basic resources and support multiple times, often to no avail, while white leaders do not. (*See* Exhibit 8 ¶ 4).

83. **Discipline Disparities**. SCC and Defendants have likewise developed and perpetuated racial disparities in disciplinary actions. Black SCC employees have faced unfair scrutiny and public reprimands that have contributed to an atmosphere of distress and professional insecurity. (*See* Exhibit 4 ¶ 4; Exhibit 8 ¶¶ 4, 5).

84. Despite adhering to established procedures, individuals have been singled out for disciplinary action in ways that were retaliatory or inconsistent with past practices. Supervisors engaged in unwarranted criticism, undermining employees' credibility in front of colleagues, further eroding trust within the workplace. (*See* Exhibit 8 ¶¶ 4, 5).

85. For example, Black employees in leadership or other positions equal to or organizationally higher than Mr. Brower have observed several instances in which white employees were not disciplined or terminated for inappropriate or illegal actions or behaviors, while Black employees were disciplined or terminated for far less serious conduct. (*See* Exhibit 4 ¶ 4; Exhibit 8 ¶¶ 4–6).

86. These include:

a. A newly-hired white Gardens Instructor (upon information and belief, Michael Walker), came to work clearly intoxicated, a terminable offense. Defendant Stewart was made aware of this offense, yet issued no disciplinary action. (*See* Exhibit 4 ¶ 4).

b. Wendy Kauffman, SCC's white Dean of Academic Support, was discovered to be falsifying her timesheets. Her supervising Vice President was made aware of the offense, yet no disciplinary actions were taken. (*See* Exhibit 4 ¶ 4).

c. SCC's white Chief Financial Officer Elizabeth "Libba" Thomas admitted to Defendant Stewart that she had misappropriated earmarked state retention funds and subsequently falsified annual reporting to the System Office. Defendant Stewart took no disciplinary action. The CFO ultimately separated from SCC, but was later hired back as an independent contractor at a higher pay rate. (*See* Exhibit 8 ¶ 5).

87. **Retaliation**. Black SCC employees have experienced retaliation in response to workplace transparency efforts and professional advancements. Unjust administrative leave and harsher disciplinary actions have disproportionately affected minority employees. (*See* Exhibit 8 ¶ 4).

88. Mr. Brower directly experienced these racialized disparities. Under Defendants' supervision and approval, Mr. Brower's white supervisors and colleagues publicly undermined his authority as CIO, second-guessed and over-scrutinized his

professional abilities and decisions, and generally disrespected Mr. Brower in a manner not demonstrated towards white colleagues.

89.     Several Black SCC employees—including Mr. Brower—informed their supervisors and SCC leadership including but not limited to Defendants about these racial disparities. (*See* Exhibit 4 ¶ 7; Exhibit 8 ¶ 7). However, Defendants failed to timely or effectively respond to these disparities. (*See* Exhibit 4 ¶ 7).

90.     For example, in a February 2023 email, Mr. Brower informed SCC interim President Brenda Jackson that his knowledge and professional reputation was disproportionately disrespected, his decisions and recommendations were disproportionately scrutinized, and a custom of passive aggression among SCC leadership constantly put him on the defensive and made him feel like he had "a target on his back." SCC took no action.

91.     Upon information and belief, SCC COO Ron Layne also informed Defendants Farmer and Stewart about racial disparities at SCC, including significant and systemic pay disparities. SCC took no action in response other than to deny the accusation.

92.     Notably, however, after multiple EEOC charges (discussed *infra*), SCC has recently admitted to pay disparities and is purportedly planning on adjusting pay.

93.     In short, the racial discrimination and hostile work environment at SCC experienced by Black employees was no secret. To the contrary, it was widely known

at all levels of SCC leadership, including Defendants. (*See* Exhibit 4 ¶ 7; Exhibit 8 ¶ 7).

94.    These racial disparities were known, maintained, and perpetuated by SCC employees under Defendants' supervision, including CFO Thomas, Dean Kauffman, Vice President Kellie Shoemake, Vice President of Instruction/Chief of Staff Julie Voight, Provost Rebecca Roush, and COO Layne.

95.    Defendants knew that members of SCC's leadership team, including but not limited to those named above, contributed to SCC's racial disparities and hostile work environment for Black employees, especially those in leadership positions.

96.    However, Defendants failed to adequately supervise, train, or discipline these employees to timely and effectively respond to the known racial disparities and hostile work environment.

97.    These racial disparities and hostile work environment under Defendants' supervision were present and active in the summer and fall of 2024 during the events that gave rise to this action, and directly contributed to Mr. Brower's wrongful termination.

**Mr. Brower's Role and Wrongful Termination**

98.    As Chief Information Officer, Mr. Brower held a significant C-Suite leadership role at SCC. He reported directly to Executive Vice President Farmer.

99.    Mr. Brower's knowledge of policies and practices regarding CIOs is extensive. From 2015 to 2018, Mr. Brower served as the Chair of the North Carolina Community Colleges statewide IT Standard Committee. This Committee is

comprised of CIOs and system administrators across the state, and promulgate a suite of policies, procedures, and standards to provide guidance all North Carolina community colleges.

100. In 2018, while Mr. Brower was Chair, the IT Standards Committee promulgated an Access Control Policy (Document No. SCIO-SEC-301). This policy establishes that "the Chief Information Officer (CIO), the Chief Information Security Officer (CISO), or other designated organizational officials at the senior leadership level are assigned the responsibility for the continued development, implementation, dissemination, and maintenance of information security policies, procedures, security controls, and control techniques to address the Access Control process."

101. Mr. Brower's employment responsibilities as CIO included: developing and leading SCC's overall information technology strategy; overseeing the day-to-day operations of all IT functions; implementing and monitoring cybersecurity protocols and risk management; providing technology solutions to academic and administrative departments; managing IT budgets, purchasing, and vendor relationships; supervising IT staff; and overseeing IT policy and compliance.

102. As CIO, Mr. Brower was responsible for assisting SCC's response to public records requests that included electronically stored information, such as emails.

103. Pursuant to SCC Policy 9.2, Mr. Brower as CIO had approval and/or authority to access SCC computers for purposes within the scope of his job responsibilities, such as facilitating SCC's response to public records requests.

104. Indeed, SCC's Information Technology Resources and Acceptable Use Policy expressly establishes that the college, through its agents, maintains "the right to access, review, and monitor the use of computing resources. This includes but is not limited to equipment and usage, as well as the data that is stored or transmitted."

105. Accordingly, accessing SCC computers in order to facilitate SCC's response to a public records request falls squarely within Mr. Brower's responsibilities and authority as CIO.

106. On August 20, 2024, Defendant Stewart, Defendant Farmer, and Mr. Brower received an extensive public records request from Chreatha Alston, an African American woman who had served as SCC's Senior Director of Human Resources and Title IX Coordinator from December 2021 to August 2024.

107. This was in relation to Ms. Alston's EEOC charge of discrimination. The events leading up to Ms. Alston's decision to resign and her subsequent EEOC charge are captured in her attached declaration, and include:

> Ultimately, in my time at SCC I witnessed decisions made by SCC leadership including President Stewart that I believe reflect unfair hiring practices, misuse of taxpayer funds, and discriminatory practices in supervision, oversight, promotions, assignments, transfers, and salary assignments, resulting in disparate treatment and impact on protected classes of employees.

> I raised concerns during scheduled one-on-one meetings and with senior leadership, but my concerns were ignored, leading to a harmful and volatile work environment. This ultimately compelled me to resign under duress for my mental well-being.

> I observed actions that I believe devalued the role of HR, including the appointment of individuals to roles for which they lacked experience, suppression of my ability to comply with federal Title IX regulations, and disregard for the contributions of long-serving employees.

> I also put SCC on notice of these discriminatory practices and actions by email to senior leadership on August 21, 2024. A true and accurate copy of that email is attached hereto as <u>Exhibit A</u>. In response, SCC issued a blanket denial, and offered to pay me in exchange for my silence. I refused.

(Exhibit 4).

108. Ms. Alston's public records request included, among other records, certain email and text communications made by Defendant Stewart, Defendant Farmer, and other members of SCC's leadership team.

109. On August 21, 2024, Mr. Brower met with Defendants Stewart and Farmer in Defendant Stewart's office. The purpose of the meeting was to create a plan to respond to Ms. Alston's public records request.

110. During the meeting, Mr. Brower discussed with Defendants Stewart and Farmer the necessary "queries" to pull emails from applicable email accounts that were responsive to the public records request. Mr. Brower also informed Defendants Stewart and Farmer that he would be accessing their email accounts in order to run the necessary queries to pull emails that were responsive to the public records request.

111. Defendant Stewart, Defendant Farmer, and Mr. Brower discussed that once Mr. Brower had collected the responsive records, they would need to be reviewed by SCC legal counsel for potential redaction.

112. Mr. Brower then informed Defendants Stewart and Farmer that he did not yet know how to properly collect responsive text messages from cell phones. Mr. Brower stated that he would need to conduct further research to learn how to do that.

Mr. Brower informed Defendants Stewart and Farmer that he would get back to them about the proper method of pulling responsive text messages upon further research.

113. At the conclusion of the August 21, 2024 meeting, Mr. Brower believed that he was "good to go" to begin working on collecting responsive emails for the public records request.

114. The August 21, 2024 meeting in Defendant Stewart's office lasted approximately 10–15 minutes.

115. After the August 21, 2024 meeting, Mr. Brower met with IT staff member Jonathan McLeod to discuss how to retrieve emails responsive to the public records request. Despite his deep IT experience, Mr. Brower did not much have familiarity with this type of email and ESI collection.

116. Mr. McLeod and Mr. Brower agreed that Mr. Brower would retrieve responsive emails by accessing each SCC computer to run the queries that would identify and collect responsive emails.

117. On August 22, 2024, Mr. Brower began working on the public records request by collecting responsive emails.

118. First, Mr. Brower used his own computer to test queries to use in the collection the responsive emails.

119. Next, Mr. Brower called Defendant Stewart's executive assistant Teressa Sheets to ask if Defendant Stewart was in his office as he intended to access the SCC computer in Defendant Stewart's office as a part of efforts.

120. Mr. Brower's access to the President's office and computer was not only allowed under SCC policy, but also routine. Under President Dempsey's tenure, Mr. Brower would regularly conduct IT support on President Dempsey's office computer while he was not present. This timing was intentional—it allowed Mr. Brower to perform his IT support duties without disrupting President Dempsey's work.

121. Ms. Sheets was aware that Mr. Brower had previously accessed the President's office to provide IT support while the President was out of the office.

122. Mr. Brower walked to Ms. Sheets' office, spoke with Ms. Sheets, and entered Defendant Stewart's office with Ms. Sheets from Ms. Sheets' adjoining office. Defendant Stewart was not present.

123. Once in Defendant Stewart's office, Mr. Brower noticed that Defendant Stewart was logged into his SCC computer, such that Mr. Brower did not need to enter any credentials to access the computer.

124. Using Defendant Stewart's SCC computer, Mr. Brower began setting up the queries necessary to pull responsive emails from Defendant Stewart's email account. Mr. Brower did not read any of Defendant Stewart's emails during this process.

125. After a few minutes, Mr. Brower received an unrelated IT call that required his immediate attention. He left Defendant Stewart's office to attend to this IT matter.

126. After responding to the unrelated IT matter, Mr. Brower returned to Ms. Sheets' office. Ms. Sheets was present when Mr. Brower returned. Mr. Brower again

walked through Ms. Sheets' office to access Defendant Stewart's office. Mr. Brower again sat at the SCC computer in Defendant Stewart's office to run the necessary email queries.

127. During this process, did not send any emails from Defendant Stewart's account to his own account, or from his own account to Defendant Stewart's account.

128. A few minutes later, Defendants Stewart and Farmer entered Defendant Stewart's office together.

129. Defendant Stewart expressed surprise and anger that Mr. Brower was in his office and working at his computer. Defendant Stewart asked Mr. Brower what he was doing there.

130. Caught off-guard by Defendant Stewart's reaction, Mr. Brower explained that he had begun working on the response to the public records request as they had discussed the previous day, and needed to access Defendant Stewart's office and computer in order to do so.

131. Defendant Stewart told Mr. Brower that he had not given Mr. Brower permission to access his office and computer without him present, and stated that he would "need to look into" this incident and document what had happened.

132. Upon information and belief, no written SCC policy prohibits the Chief Information Officer from accessing an SCC computer to perform a job responsibility.

133. Mr. Brower expressed his sincere apologies for the misunderstanding and reiterated that he had only accessed Defendant Stewart's office and computer to

begin working on the public records request as they had discussed. Mr. Brower then left Defendant Stewart's office.

134. The following day, August 22, 2024, Defendants Stewart and Farmer requested that Mr. Brower meet with them in Defendant Stewart's office.

135. SCC's legal counsel was also present at this meeting.

136. At Defendant Stewart's request, Mr. Brower summarized the events of the previous day. He reiterated that he had accessed Defendant Stewart's office with Ms. Sheets' permission, and had only done so to begin working on the response to the public records request as he, Defendant Stewart, and Defendant Farmer had discussed on August 21.

137. Defendant Stewart recounted their August 21 meeting, and stated that he never gave Mr. Brower permission to access his office or computer without Defendant Stewart being present.

138. Defendants Stewart and Farmer then informed Mr. Brower that they were placing him on administrative leave while they conducted a further investigation into the incident.

139. Defendants Stewart and Farmer then asked Mr. Brower to sign an administrative leave document. Mr. Brower was unfamiliar with the document, and told Defendants Stewart and Farmer that he was not comfortable signing the document without his own legal counsel present.

140. After conferring privately with their legal counsel, Defendants Stewart and Farmer asked Mr. Brower to instead write and sign a handwritten statement

acknowledging that he was being placed on administrative leave and confirming that he would "not attempt to access any college owner systems nor provide any directives nor any information to anyone else to access college owned resources."

141. Mr. Brower wrote and signed this statement in compliance with Defendant Stewart and Farmers' request.

142. Mr. Brower told Defendants Stewart and Farmer that he was "bewildered" by their decision to place him on administrative leave. He stated that he was only trying to fulfill his job responsibilities in a timely manner and that accessing Defendant Stewart's office and computer was a part of his scope of work.

143. Defendant Farmer then escorted Mr. Brower to Mr. Brower's office to collect personal items before leaving SCC.

144. On August 28, 2024, Mr. Brower submitted an "Inquiry Information" form to the EEOC alleging racial discrimination, sex discrimination (sexual orientation), hostile work environment, and retaliation in violation of Title VII against SCC arising from these events.

145. That same day, Mr. Brower informed Defendants in writing that he had submitted an EEOC inquiry alleging racial discrimination and retaliation in violation of Title VII against SCC.

146. After being placed on administrative leave on August 23, 2024, Mr. Brower fully complied with all terms and requirements of his administrative leave.

147. On November 1, 2024, Mr. Brower attended a meeting with Defendant Stewart, Defendant Farmer, SCC's legal counsel, and his own legal counsel in

Defendant Stewart's office. The purpose of this meeting was to update Mr. Brower on the investigation, for Defendant Farmer to make a formal recommendation to Defendant Stewart about Mr. Brower's employment, and to allow Mr. Brower an opportunity to respond to Defendant Farmer's recommendation and provide any additional information.

148. During this meeting, Defendant Farmer read a "Written Notice of Charges" letter aloud. The letter stated that Defendant Farmer was recommending Mr. Brower's dismissal "based on [Mr. Brower's] improperly entering the President's office and accessing his computer while he was not present and accessing information, including privileged information, without authorization or permission." (*See* Exhibit 5 p 1, SCC Written Notice of Charges).

149. The Notice of Charges letter also raised two new allegations that had never previously been mentioned to Mr. Brower. (*See* Exhibit 5 p 2–3).

150. First, the Notice of Charges letter alleged that while Mr. Brower was using Defendant Stewart's computer, he logged onto his own email account via web browser. (Exhibit 5 p 2).

151. Second, the Notice of Charges letter alleged that during this incident, Mr. Brower "printed some emails from the President's computer to the printer in Ms. Sheets' office[,] . . . retrieved those emails from the printer, reviewed them, and asked Ms. Sheets to shred them. Ms. Sheets preserved those printed emails, one of which was an email between the President and legal counsel." (Exhibit 5 p 2–3).

152. This was the first time that Defendants ever mentioned these new allegations to Mr. Brower.

153. Citing these two allegations, the Notice of Charges letter stated that Mr. Brower's "failure to disclose" these details led Defendant Farmer "to lose trust in [Mr. Brower's] judgment and thus, [Mr. Brower's] ability to effectively do your job." (Exhibit 5 p 4).

154. The Notice of Charges letter concluded that Mr. Brower "purposefully and intentionally accessed the President's office and email without authority or permission to do so," thus "constitute[ing] gross personal misconduct" warranting immediate dismissal. (Exhibit 5 p 4).

155. The Notice of Charges letter did not identify any written SCC policy prohibiting the Chief Information Officer from accessing a SCC computer to perform tasks within his job responsibilities.

156. In response, Mr. Brower reiterated that after his August 21 meeting with Defendants Stewart and Farmer, he was under the impression that he needed to begin working in a timely manner to respond to the public records request.

157. Mr. Brower stated that he did not remember accessing his own email account from the SCC computer in Defendant Stewart's office, but acknowledged that he could have done that to further test the queries on his own account.

158. Mr. Brower denied printing, reading, or tearing any emails. He noted that there would be absolutely no reason for him to do so, when he could access any emails from his own computer.

159.  Mr. Brower reiterated that the intent behind his actions on August 21 was to do his work and to help Defendants Stewart and Farmer, and that he did not take any actions with malintent.

160.  Mr. Brower further explained to Defendants Stewart and Farmer that under President Dempsey he often conducted IT work while the President was out of the office in order to not disrupt the President's work, and sought to do the same under Defendant Stewart.

161.  Mr. Brower requested that Defendants take into account his 18 years of prior service to SCC without any disciplinary actions.

162.  Mr. Brower expressed regret about being in Defendant Stewart's office without Defendant Stewart's express permission, and stated his willingness to accept an alternative, lesser consequence in recognition of that misunderstanding.

163.  Finally, Mr. Brower requested that Defendants Stewart and Farmer provide evidence of the allegedly printed emails in the form of the emails themselves, a picture or copy, or an easily-accessibly printing log.

164.  Mr. Brower, either personally or through counsel, has repeatedly renewed this request in the months since the November 1, 2024 meeting.

165.  Defendants have never provided evidence of these allegedly printed emails in any form.

166.  At the conclusion of the November 1, 2024 meeting, Defendants Stewart and Farmer stated that they would consider Mr. Brower's responses and notify him of Defendant Stewart's final decisions at a later date.

167. On November 9, 2024, Mr. Brower provided a further written response to the November 1, 2024 Notice of Charges letter.

168. Therein, Mr. Brower noted that Defendants' actions during his administrative leave lacked transparency and violated SCC policy. (*See* Exhibit, 6 p 1, Brower Rebuttal Statement).

169. Mr. Brower again denied printing, reading, or tearing any emails, and again requested copies of the allegedly printed and torn emails. (*See* Exhibit 6, p 2).

170. Mr. Brower also informed Defendants that his harsh treatment during the administrative leave process, including being walked out of the school "like a criminal" and denied access to all work materials and colleagues, was significantly worse than how white employees had been treated after much more severe misconduct, including coming to work intoxicated or lying about their hours. (*See* Exhibit 6 p 2).

171. On November 11, Defendant Stewart terminated Mr. Brower from his employment as CIO of SCC via a Written Notice of Dismissal. (*See* Exhibit 7, SCC Notice of Dismissal).

172. Therein, Defendant Stewart provided substantially the same reasoning as noted in Defendant Farmer's November 1 Notice of Charges letter. Defendant Stewart's Notice of Dismissal letter concluded that Mr. Brower's actions "constitute[d] gross misconduct and warrant[ed] dismissal from [his] position." (*See* Exhibit 7, p 7).

173.   Defendant Stewart's Notice of Dismissal letter did not identify any written SCC policy prohibiting the Chief Information Officer from accessing a SCC computer to perform tasks within his job responsibilities.

174.   Upon information and belief, after Mr. Brower's dismissal, Defendants selected Mr. Brower's former subordinate, Jonathan McLeod, to replace Mr. Brower as SCC's CIO.

175.   Mr. McLeod is white, significantly younger, and less experienced than Mr. Brower for his position.

**Exhaustion of Administrative Remedies**

176.   On August 28, 2024, Mr. Brower filed an Inquiry Information form with the EEOC against SCC alleging racial discrimination, sex discrimination, hostile work environment, and retaliation in violation of Title VII. (*See* Exhibit 1).

177.   Mr. Brower's EEOC Inquiry was assigned EEOC number 430-2024-04233. (*See* Exhibit 1).

178.   On January 7, 2025, Mr. Brower filed a Charge of Discrimination against SCC with the EEOC alleging wrongful termination, racial discrimination, hostile work environment, and retaliation in violation of Title VII. (EEOC No. 430-2024-04233) (*See* Exhibit 2).

179.   On January 23, 2025, the EEOC issued a Determination and Notice of Rights notifying Mr. Brower that the EEOC would not proceed with its investigation and making no determination about whether further investigation would establish Title VII violations. (EEOC No. 430-2024-04233) (*See* Exhibit 3).

180. Accordingly, Mr. Brower has exhausted all applicable administrative remedies in this matter.

**Evidence of Pretext**

181. When viewed in context, Defendants' stated reasoning for terminating Mr. Brower is revealed as pretextual.

182. Mr. Brower's accessing of Defendant Stewart's office and computer were completed in furtherance of Mr. Brower's duties as CIO in helping Defendants respond to a public records request.

183. No written SCC policy prohibited Mr. Brower as CIO from accessing a SCC computer to facilitate the completion of a public records request, a task squarely within his duties as CIO.

184. During Mr. Brower's August 21, 2024 meeting with Defendants Stewart and Farmer planning their response to the public records request, Mr. Brower informed Defendants Stewart and Farmer that he would need to access their email accounts in order to respond to the public records request, and that he already knew how to do so. Mr. Brower left this meeting with a belief that he needed to begin working to respond to the public records request in a timely manner.

185. Mr. Brower accessed Defendant Stewart's office only after asking for and receiving Ms. Sheets' permission to do so. This belies any claim of malicious intent. If Mr. Brower intended to act covertly or for any nefarious reasons, he would not have accessed Defendant Stewart's office so after asking permission to do so. Because Mr. Brower had nothing to hide, he hid nothing.

186. At worst, Mr. Brower's actions in accessing Defendant Stewart's office and computer constitute an earnest misunderstanding or a desire to urgently complete a job assignment. Especially in light of Mr. Brower's 18 year employment history at SCC without any prior disciplinary actions, termination constituted a drastically disproportionate punishment.

187. The widespread racial disparities and hostile work environment at SCC provide further evidence of pretext and retaliation. Mr. Brower's termination fits within the well-documented and widely-known custom, pattern, and practice of racial disparities and hostile work environment at SCC, especially for Black employees in positions of leadership. Like numerous other Black SCC employees in positions of leadership, Mr. Brower's was over-scrutinized, under-supported, disrespected, and over-disciplined. In this context, Mr. Brower's actions in Defendant Stewart's office constituted a convenient excuse for Defendants to perpetuate this custom, pattern, and practice of racial disparities and hostile work environment for Black employees in leadership positions.

188. But for Mr. Brower's race, he would not have been summarily terminated by Defendants for what at worst amounted to an earnest misunderstanding or a desire to urgently complete a job assignment.

189. Mr. Brower has continually request Defendants produce information supporting their supposed reasoning for disciplinary action. This has included Mr. Brower and the undersigned asking for copies of the emails Defendants claim he printed but then for some reason didn't keep, and log/registry information inclusive

of step-by-step instructions for retrieval from the SCC computer in Defendant Stewart's office which would log and register date and time-stamped metadata for any print jobs initiated from that computer in the day in question, as well as logs and metadata related to any deletion or destruction of information from the computer in question. Brower and the undersigned asking for copies of the emails Defendants claim he printed but then for some reason didn't keep,

190. Defendants have refused and continue to refuse to produce this information under any circumstance.

191. SCC is subject to non-spoliation/preservation requirements by its own internal policies.

192. Defendants had a reasonable anticipation of litigation at the latest by August 28, 2024, when Mr. Brower put Defendants on notice by email to Defendant Farmer of his intent to file an EEOC claim.

**Mr. Brower's Damages**

193. Mr. Brower's wrongful termination from SCC by Defendants has caused him significant damages.

194. First, Mr. Brower's wrongful termination caused a significant loss of income. At the time of his termination, Mr. Brower's salary was $106,367 annually. But for his wrongful termination, Mr. Brower intended to continue working at SCC for at least two more years, through the end of 2026.

195. Mr. Brower's wrongful termination also caused in the loss of retirement income. At the time of the termination, Mr. Brower had served as a state employee

for over 28 years. But for his wrongful termination, Mr. Brower intended to retire only after at least 30 years of state employment, which would have entitled him to full benefits. Due to his wrongful termination at 28.5 years of service, Mr. Brower's retirement benefits have been significantly reduced.

196. Mr. Brower's wrongful termination caused Mr. Brower significant professional and reputational damage. It tarnished his previously clean disciplinary record. The termination record hindered Mr. Brower's ability to seek new employment, and he subsequently was forced to enroll in early retirement to maintain sufficient income.

197. Mr. Brower's wrongful termination also caused Mr. Brower severe emotional distress. After 18 years of employment at SCC, he was improperly placed on leave, cast out from his professional home, prohibited from communicating with former colleagues, and summarily terminated. He was made to pack up his personal belongings and publicly escorted out of the college. Since his wrongful termination, Mr. Brower has experienced severe mental and emotional anguish, including being clinically diagnosed with depression and anxiety related to the termination.

198. This emotional distress has had a significant disabling impact on Mr. Brower's daily living, requiring clinical mental health counseling.

199. Defendants knew or reasonably should have known that their wrongful termination of Mr. Brower in this manner would be likely to inflict severe emotional distress. This severe emotional distress was clearly foreseeable based on Defendants' racially disparate treatment and wrongful termination of Mr. Brower.

200. Defendant Stewart and Defendant Farmer's actions in inflicting this severe emotional distress through their racially disparate treatment and wrongful termination of Mr. Brower were outside the scope of their official duties.

**FIRST CAUSE OF ACTION**
**Title VII, Civil Rights Act of 1964 (42 U.S.C. § 2000e, et. seq.): Wrongful Termination, Racial Discrimination**
**(Against Defendant SCC)**

201. Plaintiff hereby incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

202. At all relevant times, Plaintiff was an SCC "employee" as defined under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(f).

203. At all relevant times, Defendants SCC was Plaintiff's "employer" as defined under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

204. At all times relevant herein, Defendants Stewart and Farmer acted as agents of Defendant SCC and as Plaintiff's supervisors.

205. Title VII prohibits employers from discharging or otherwise discriminating against any employee with respect to their compensation, terms, conditions, or privileges of employment because of the employee's race.

206. Plaintiff was qualified for his position and performed his job duties satisfactorily throughout his employment with Defendant SCC.

207. Despite Plaintiff's qualifications and performance and without legitimate reason, SCC placed Plaintiff on administrative leave on or about August 23, 2024.

208. Despite Plaintiff's qualifications and performance, Defendant SCC terminated Plaintiff's employment on November 11, 2024 through its agents, Defendants Stewart and Farmer.

209. The disciplinary action and termination of Plaintiff's employment were substantially motivated by unlawful discrimination based on Plaintiff's race in violation of Title VII.

210. Defendants' stated reasons for Plaintiff's termination were false and pretextual, and the actual reason was discriminatory in nature.

211. Plaintiff has membership in a protected class, had satisfactory job performance, suffered an adverse employment action, and was subjected to different treatment from similarly situated employees outside the protected class.

212. The comparators provided were equal to or above Plaintiff within SCC's organizational structure, engaged in conduct worse than any conduct of Plaintiff, but were not subjected to disciplinary action similar to the action taken against Plaintiff.

213. Plaintiff timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission, and received a Notice of Right to Sue dated January 23, 2025.

214. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer lost wages and benefits, emotional distress, humiliation, inconvenience, and other non-economic damages.

215. Defendants' actions were willful and in reckless disregard of Plaintiff's federally protected rights, entitling Plaintiff to punitive damages under Title VII.

216. Plaintiff is also entitled to recover reasonable attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

## SECOND CAUSE OF ACTION
**Title VII, Civil Rights Act of 1964 (42 U.S.C. § 2000e, et. seq.): Retaliation (Against Defendant SCC)**

217. Plaintiff hereby incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

218. At all relevant times, Plaintiff was an SCC "employee" as defined under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(f).

219. At all relevant times, Defendants SCC was Plaintiff's "employer" as defined under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b),

220. At all times relevant herein, Defendants Stewart and Farmer acted as agents of Defendant SCC and as Plaintiff's supervisors.

221. Title VII prohibits an employer from retaliating against an employee for opposing discriminatory practices, including the filing of or participation in an investigation or hearing under Title VII. *See* 42 U.S.C. § 2000e-3(a).

222. On or after August 28, 2024, Plaintiff engaged in protected activity under Title VII by filing an EEOC inquiry or by otherwise participating in an investigation initiated by EEOC alleging racial discrimination, sex discrimination, hostile work environment, and retaliation in violation of Title VII at SCC.

223. Prior to terminating Plaintiff, Defendants were aware of Plaintiff's protected activity, including Plaintiff's involvement in the EEOC investigation.

224. Approximately two and a half months after engagement in this protected activity, and in temporal proximity thereto, Defendants terminated Plaintiff's employment on November 11, 2024.

225. Defendants' termination of Plaintiff's employment was substantially motivated by Plaintiff's protected activity, and constitutes unlawful retaliation under Title VII.

226. Defendants' stated reason for Plaintiff's termination was false and pretextual, and the real reason was retaliatory in nature.

227. Plaintiff timely filed a charge of discrimination with the EEOC and received a Right to Sue Letter dated January 23, 2025.

228. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer lost wages and benefits, emotional distress, humiliation, inconvenience, and other non-economic damages.

229. Defendants' actions were willful and in reckless disregard of Plaintiff's federally protected rights, entitling Plaintiff to punitive damages under Title VII.

230. Plaintiff is also entitled to recover reasonable attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

## THIRD CAUSE OF ACTION
### Title VII, Civil Rights Act of 1964 (42 U.S.C. § 2000e, et. seq.): Hostile Work Environment
### (Against Defendant SCC)

231. Plaintiff hereby incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

232.  At all relevant times, Plaintiff was an SCC "employee" as defined under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(f).

233.  At all relevant times, Defendants SCC was Plaintiff's "employer" as defined under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(b).

234.  At all times relevant herein, Defendants Stewart and Farmer acted as agents of Defendant SCC and as Plaintiff's supervisors.

235.  Title VII prohibits an employer from discriminating against any individual with respect to their terms, conditions, or privileges of employment on the basis of race. This includes the creation or toleration of a hostile or abusive work environment.

236.  Throughout the course of Plaintiff's employment, Plaintiff was subjected to unwelcomed conduct by supervisors, managers, and/or coworkers, including but not limited to hyper-scrutinization, disrespect, lack of trust, pay disparities, discipline disparities, and the mistreatment and coerced resignation of colleagues and coworkers based on race.

237.  The conduct described herein was based on Plaintiff's race, and was severe and/or pervasive enough to alter the conditions of Plaintiff's employment and create a hostile or abusive work environment.

238.  Plaintiff found the work environment to be hostile and offensive, and a reasonable person in Plaintiff's position would have found the environment to be intimidating, hostile, or abusive.

239. Defendants knew or should have known of the discriminatory conduct but failed to take prompt and remedial action to stop it.

240. Plaintiff timely filed a charge of discrimination with the EEOC and received a Right to Sue Letter dated January 23, 2025.

241. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer lost wages and benefits, emotional distress, humiliation, inconvenience, and other non-economic damages.

242. Defendants' actions were willful and in reckless disregard of Plaintiff's federally protected rights, entitling Plaintiff to punitive damages under Title VII.

243. Plaintiff is also entitled to recover reasonable attorney's fees and costs pursuant to 42 U.S.C. § 2000e-5(k).

## FOURTH CAUSE OF ACTION
### 42 U.S.C. § 1983: Hostile Work Environment in Violation of Plaintiff's Rights Secured under 42 U.S.C. § 1981
### (Against Defendants Stewart and Farmer in their individual capacities)

244. Plaintiff hereby incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

245. This claim is brought against Defendants Stewart and Farmer in their individual capacities.

246. 42 U.S.C. § 1983 provides a civil cause of action against any person who, under color of state law, subjects or causes to be subjected another person to a deprivation of rights, privileges, or immunities secured by the Constitution or laws of the United States.

247. 42 U.S.C. § 1981 guarantees all persons within the jurisdiction of the United States the same right to make and enforce contracts as is enjoyed by white citizens, which includes the right to work in an environment free from racial discrimination.

248. At all relevant times, Defendants Stewart and Farmer were acting under color of state law and in their respective capacities as President and Executive Vice President of SCC, a North Carolina public community college.

249. Plaintiff, as an African American, is entitled to the protections afforded under § 1981.

250. Throughout Plaintiff's employment with Defendants, Plaintiff was subjected to a continuous pattern of unwelcomed and offensive conduct by supervisors, managers, and/or coworkers based on Plaintiff's race. This conduct included but was not limited to hyper-scrutinization, disrespect, lack of trust, pay disparities, discipline disparities, and the mistreatment and coerced resignation of colleagues and coworkers based on race.

251. The racially disparate conduct was both objectively and subjectively offensive, was based on race, and was sufficiently severe and/or persistent as to alter the condition of Plaintiff's employment and create a hostile or abusive work environment.

252. Defendants knew or should have known of the racially hostile work environment but failed to take prompt and appropriate remedial action to prevent or stop the harassment.

253. Defendants' conduct was intentionally, willful, and in reckless disregard of Plaintiff's federally protected rights under § 1981.

254. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer lost wages and benefits, emotional distress, humiliation, inconvenience, and other non-economic damages.

255. Defendants' actions were taken with malice and/or reckless indifference to Plaintiff's constitutional rights, entitling Plaintiff to punitive damages to the extent allowed by law.

256. Plaintiff is entitled to all appropriate relief under 42 U.S.C. § 1983, including compensatory damages, punitive damages, and an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**FIFTH CAUSE OF ACTION**
**42 U.S.C. § 1983: Retaliation in Violation of Plaintiff's Rights Secured Under 42 U.S.C. § 1981**
**(Against Defendants Stewart and Farmer in their individual capacities)**

257. Plaintiff hereby incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

258. This claim is brought against Defendants Stewart and Farmer in their individual capacities.

259. 42 U.S.C. § 1983 provides a civil cause of action against any person who, under color of state law, subjects or causes to be subjected another person to a deprivation of rights, privileges, or immunities secured by the Constitution or laws of the United States.

260. At all relevant times, Defendants Stewart and Farmer were acting under color of state law and in their respective capacities as President and Executive Vice President of SCC, a North Carolina public community college.

261. 42 U.S.C. § 1981 guarantees all persons within the jurisdiction of the United States the same right to make and enforce contracts as is enjoyed by white citizens, which includes the right to be free from retaliation for opposing racial discrimination in the workplace.

262. Plaintiff, as an African American, is entitled to the protections afforded under § 1981.

263. Plaintiff engaged in protected activity under § 1981 by complaining about, reporting, or otherwise opposing race-based discrimination and/or harassment in the workplace, including but not limited to the disproportionate over-scrutiny, disrespect, over-disciplining, and under-paying of Black SCC employees.

264. Defendants were aware of Plaintiff's protected activity.

265. Shortly after engaging in this protected activity, Plaintiff was subjected to adverse employment actions by Defendants, including but not limited to being placed on administrative leave, investigated, and terminated.

266. These adverse employment actions taken by Defendants against Plaintiff were motivated by retaliatory animus and were in direct response to Plaintiff's protected conduct.

267. Defendants' conduct constitutes unlawful retaliation in violation of 42 U.S.C. § 1981.

268. Defendants' conduct was intentionally, willful, and in reckless disregard of Plaintiff's federally protected rights under § 1981.

269. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer lost wages and benefits, emotional distress, humiliation, inconvenience, and other non-economic damages.

270. Defendants' actions were taken with malice and/or reckless indifference to Plaintiff's constitutional rights, entitling Plaintiff to punitive damages to the extent allowed by law.

271. Plaintiff is entitled to all appropriate relief under 42 U.S.C. § 1983, including compensatory damages, punitive damages, and an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### SIXTH CAUSE OF ACTION
### 42 U.S.C. § 1983: Racial Discrimination
### (Against Defendants Stewart and Farmer in their individual capacities)

272. Plaintiff hereby incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

273. This claim is brought against Defendants Stewart and Farmer in their individual capacities.

274. 42 U.S.C. § 1983 provides a civil cause of action against any person who, under color of state law, subjects or causes to be subjected another person to a deprivation of rights, privileges, or immunities secured by the Constitution or laws of the United States.

275. At all relevant times, Defendants Stewart and Farmer were acting under color of state law and in their respective capacities as President and Executive Vice President of SCC, a North Carolina public community college.

276. The Equal Protection Clause of the Fourteenth Amendment prohibits state actors from engaging in or permitting racial discrimination in public employment.

277. Plaintiff is a member of a protected racial group and was qualified for his position as CIO of SCC.

278. Defendants Stewart and Farmer, acting under color of law, intentionally discriminated against Plaintiff on the basis of race with respect to the conditions of Plaintiff's employment, including but not limited to Defendants' wrongful termination of Plaintiff on the basis of Plaintiff's race and Defendants' knowledge and fostering of racial disparities at SCC, such as the disproportionate over-scrutiny, disrespect, over-disciplining, and under-paying of Black SCC employees.

279. Similarly situated employees outside of Plaintiff's protected class were treated more favorably under comparable circumstances.

280. Defendants' discriminatory actions were intentional and taken with discriminatory animus, and were not justified by any legitimate government interest.

281. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer lost wages and benefits, emotional distress, humiliation, inconvenience, and other non-economic damages.

282. Defendants' actions were taken with malice and/or reckless indifference to Plaintiff's constitutional rights, entitling Plaintiff to punitive damages to the extent allowed by law.

283. Plaintiff is entitled to all appropriate relief under 42 U.S.C. § 1983, including compensatory damages, punitive damages, and an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### SEVENTH CAUSE OF ACTION
**42 U.S.C. § 1983: Supervisory Liability**
**(Against Defendants Stewart and Farmer in their individual capacities)**

284. Plaintiff hereby incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

285. This claim is brought against Defendants Stewart and Farmer in their individual capacities.

286. 42 U.S.C. § 1983 provides a civil cause of action against any person who, under color of state law, subjects or causes to be subjected another person to a deprivation of rights, privileges, or immunities secured by the Constitution or laws of the United States.

287. The Equal Protection Clause of the Fourteenth Amendment prohibits state actors from engaging in or permitting racial discrimination in public employment.

288. At all relevant times, Defendants Stewart and Farmer were acting under color of state law and in their respective capacities as President and Executive Vice President of SCC, a North Carolina public community college.

289. Plaintiff, a member of a protected racial group, was subjected to unlawful and intentional racial discrimination by the subordinates of Defendants, including but not limited to CFO Thomas, Provost Roush, Vice President Layne, Vice President Shoemake, and Dean Kauffman, through acts including but not limited to the disproportionate over-scrutiny, disrespect, over-disciplining, and under-paying of Black SCC employees.

290. Defendants Stewart and Farmer, as supervisors and policymakers, had actual or constructive knowledge of the racially discriminatory conduct described herein.

291. Defendants Stewart and Farmer failed to take reasonable steps to prevent or remedy this discrimination, despite being in a position to do so and having a duty to ensure constitutional compliance.

292. Defendants either personally participated in the unconstitutional conduct, directed or encouraged it, knew of it and acquiesced in it, or implemented or maintained policies, customs, or practices that allowed or encouraged such discrimination to occur.

293. Defendants' actions and omissions constituted deliberate indifference to Plaintiff's constitutional rights and directly caused or substantially contributed to the constitutional deprivation Plaintiff suffered.

294. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer lost wages and benefits, emotional distress, humiliation, inconvenience, and other non-economic damages.

295.  Defendants' actions were taken with malice and/or reckless indifference to Plaintiff's constitutional rights, entitling Plaintiff to punitive damages to the extent allowed by law.

296.  Plaintiff is entitled to all appropriate relief under 42 U.S.C. § 1983, including compensatory damages, punitive damages, and an award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### EIGHTH CAUSE OF ACTION
**North Carolina Common Law Wrongful Discharge**
**(Against Defendant SCC)**

297.  Plaintiff hereby incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

298.  North Carolina recognizes a common law cause of action for wrongful discharge where an employee is terminated for reasons that violate the public policy of the state. *See Coman v. Thomas Mfg. Co.*, 325 N.C. 172 (1989).

299.  At all relevant times, Plaintiff was an employee of Defendant SCC and performed his job duties in a satisfactory and professional manner.

300.  Defendant SCC, through its agents Defendants Stewart and Farmer, terminated Plaintiff's employment on or about November 11, 2024.

301.  Plaintiff's termination was motivated in whole or in part by Plaintiff's race and/or Defendants' racially discriminatory animus.

302.  The public policy of the State of North Carolina, as set forth in the North Carolina Equal Employment Practices Act, N.C.G.S. § 143-422.2, prohibits employers

from discharging or otherwise discriminating against any individual on the basis of race. This statute reflects a clear and fundamental public policy of the State.

303. Plaintiff's discharge by Defendants on the basis of race constitutes a wrongful termination in violation of that public policy.

304. Upon information and belief, Defendant SCC has purchased a liability insurance policy that covers this claim, and has thus waived sovereign immunity to the extent of the insurance policy.

305. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer lost wages and benefits, emotional distress, humiliation, inconvenience, and other non-economic damages.

306. Defendants' conduct was willful, malicious, and in reckless disregard of Plaintiff's rights, entitling Plaintiff to punitive damages under North Carolina law.

307. Plaintiff is entitled to recover all available remedies under North Carolina common law for wrongful discharge, including compensatory damages, punitive damages, and the costs of this action.

### NINTH CAUSE OF ACTION
**North Carolina Common Law Negligent Infliction of Emotional Distress**
**(Against Defendants Stewart and Farmer in their individual capacities)**

308. Plaintiff hereby incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

309. This claim is brought against Defendants Stewart and Farmer in their individual capacities.

310.  Under North Carolina law, a claim for negligent infliction of emotional distress may be maintained where a defendant's negligent conduct causes the plaintiff to suffer severe emotional distress, and where such emotional distress was a reasonably foreseeable result of the defendants' conduct.

311.  At all relevant times, Defendants owed Plaintiff a duty to refrain from engaging in or permitting discriminatory, harassing, or otherwise unlawful conduct in the workplace, including racial discrimination in violation of public policy.

312. Defendant breached this duty by negligently engaging in and/or permitting racially discriminatory treatment of Plaintiff in the workplace, including but not limited to subjecting Plaintiff to disparate treatment on the basis of race, failing to address racially discriminatory conduct, and ultimately terminating Plaintiff's employment based on racial animus.

313.  Defendant knew or should have known that such conduct and wrongful termination would foreseeably cause Plaintiff to suffer severe emotional distress.

314.  As a direct and proximate result of Defendants' negligent conduct, Plaintiff did in fact suffer severe emotional distress, including but not limited to clinically diagnosed depression and anxiety.

315.  Plaintiff's emotional distress was genuine, severe, and of a nature that no reasonable person could be expected to endure.

316. Because Defendant Stewart and Defendant Farmer's actions in inflicting this severe emotional distress through their racially disparate treatment

and wrongful termination of Mr. Brower were outside the scope of their official duties, they are not shielded by public official immunity.

317. Defendants' conduct was willful, wanton, and in reckless disregard of Plaintiff's rights, entitling Plaintiff to punitive damages under North Carolina law.

318. Plaintiff is entitled to recover all available damages for negligent infliction of emotional distress under North Carolina law, including compensatory damages for emotional and psychological harm, and punitive damages as permitted by law.

## PRAYER FOR RELIEF

Plaintiff respectfully prays for the following relief:

1. That this Court find Defendant SCC liable for wrongful termination, hostile work environment, retaliation, and racial discrimination in violation of Title VII, 42 U.S.C. § 1981;

2. That this Court find Defendants jointly or severally liable for wrongful termination, hostile work environment, retaliation, and racial discrimination in violation of 42 U.S.C. § 1983;

3. That this Court find Defendants jointly and severally liable for wrongful discharge in violation of public policy and negligent infliction of emotional distress under North Carolina common law;

4. That Plaintiff is entitled to recover from Defendants any and all pay, backpay, and/or loss of retirement benefits (inclusive of state pension and social security benefits);

5. That Plaintiff is entitled to recover from Defendants compensatory damages in an amount determined by the jury in an amount in excess of $25,000;

6. That Plaintiff is entitled to recover punitive damages in an amount to be determined by the jury on each of the above-stated claims;

7. That Plaintiff is entitled to recover from Defendants the reasonable costs of this action, as well as and/or including reasonable attorneys' fees as permitted by Title VII, 42 U.S.C. § 1981, 42 U.S.C. § 1988, and North Carolina common law;

8. That Plaintiff is entitled to recover pre-judgment and post-judgment interest on all damages awarded herein;

9. That all damages and costs by assessed and enforced jointly and severally against all Defendants as appropriate and allowed by law;

10. That this Court enjoin Defendants from future racially disparate treatment of Black employees in violation of Title VII, 42 U.S.C. § 1981, and 42 U.S.C. § 1983; and

11. That this Court grant such other relief as it deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted, this the 23rd day of April, 2025.

                          **BALLEW PURYEAR PLLC**

                          /s/ Paul J. Puryear, Jr.
                          Paul J. Puryear, Jr.
                          N.C. State Bar No.: 41536
                          4000 Westchase Blvd., Bldg. II
                          Suite 300
                          Raleigh, NC 27607
                          Phone: 984-370-3030
                          Fax: 984-960-1982
                          ppuryear@ballewlaw.com